2021 IL App (1st) 200338

No. 1-20-0338

Fourth Division
March 31, 2021

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| RAYMOND CAHNMAN, | ) | |
| | ) | Appeal from the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County. |
| | ) | |
| v. | ) | Nos.  2013 CH 26214 |
| | ) | 2013 L 11973 |
| TIMBER COURT LLC; DAVID ZAZOVE; and | ) | 2014 L 9779 |
| BARRON DEVELOPMENT, LLC, | ) | (cons.) |
| | ) | |
| Defendants | ) | The Honorable |
| | ) | Sanjay Tailor, |
| (David Zazove, | ) | Judge Presiding. |
| Defendant-Appellant). | ) | |

_____

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices Lampkin and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiff Raymond Cahnman and defendant David Zazove were long-time business partners who had invested in multiple businesses together until plaintiff discovered that defendant had allegedly been engaged in self-dealing and other breaches of his fiduciary duty. Plaintiff filed a complaint against defendant, alleging numerous causes of action, and the parties engaged in extensive litigation, ultimately culminating in a seven-day bench trial with a 136-page opinion by the trial court, in which the court found in plaintiff's favor on all but one count. The trial court entered a total judgment in favor of plaintiff and against defendant

in the amount of $7,719,877.34, which included $2,664,651.10 as punitive damages. After the trial court's judgment, defendant sought to amend his pleadings to add affirmative defenses based on the statute of limitations and *laches*, which the trial court denied. Defendant now appeals, claiming that the trial court abused its discretion in denying him leave to amend his pleadings. Defendant further claims that the trial court's judgment was against the manifest weight of the evidence because it was internally inconsistent and that the trial court erred in awarding plaintiff punitive damages. For the reasons that follow, we affirm.

¶ 2                                    BACKGROUND

¶ 3      As noted, the instant litigation was extensive, culminating in a seven-day bench trial with a 136-page opinion by the trial court.[1] On appeal, neither party challenges the trial court's factual findings; the only challenge related to the court's findings is a claim that the findings themselves were internally inconsistent. Accordingly, our discussion of the relevant facts comes from the trial court's opinion, unless noted otherwise.

¶ 4                         I. Plaintiff and Defendant's Relationship

¶ 5      Plaintiff and defendant have known each other since 1979, when defendant was assigned to work with plaintiff at the Chicago Board of Trade, and plaintiff became defendant's mentor. In the mid- to late-1980s, defendant approached plaintiff about investing in real estate projects. Plaintiff was a trader and had no background in real estate, but defendant proposed that plaintiff would provide the funds for the various entities and developments, while defendant would contribute his time and effort to develop and supervise the projects in exchange for equity. This arrangement provided defendant with an incentive to make the projects succeed, as he would receive half of the profits without investing any of his personal funds. The projects were

_____

[1]Indeed, the record on appeal alone consists of over 31,000 pages.

designed to be short term, and defendant was not to receive any salary or fees. Since the 1980s, at defendant's request, plaintiff has invested in at least 10 different projects that defendant, or an entity controlled by defendant, was involved in developing.

¶ 6     Additionally, defendant managed or owned a number of entities in which plaintiff owned an interest. Specifically, both plaintiff and defendant were shareholders, members, or partners of Timber Court LLC (Timber Court), Lincoln Avenue LP (Lincoln), Water Street Development Corp. (Water Street), Tandem Realty Corp. (Tandem), CZ Investors LP (CZ), and Jackson Center LLC (Jackson). Timber Court, Lincoln, and Water Street were all involved in developing certain parcels of real estate: (1) Timber Court developed a two-building, 72-unit residential condominium complex in Arlington Heights, owned and leased 48 of the units, and owned an adjacent parcel of land; (2) Lincoln developed and owned a four-story commercial building and parking lot in Chicago; and (3) Water Street developed a two-building, 85-unit residential condominium complex in Milwaukee, Wisconsin, and owned and leased five of the units and their associated boat slips and parking spots. Tandem provided real estate management services; when defendant obtained a broker's license, he used it at Tandem, and Tandem served as property manager for Lincoln, Timber Court, and Water Street at various times. Jackson owned a commercial building in Chicago and operated a business center with an executive suites office facility.

¶ 7     Defendant was also the sole owner of Tandem Investments, LLC (Tandem Investments), Water Street Investment Corporation (Water Street Investment), and Lakeview Executive Suites, LLC (LES). However, plaintiff was not aware that defendant owned Tandem Investments, Water Street Investment, or LES until 2012.

¶ 8        Defendant drafted the operating agreements for the entities he managed and was responsible for their finances. Defendant, who had worked as a certified public accountant at one point, also kept accounting records for the entities he managed. Beginning in 1998 or 2000, defendant used QuickBooks to keep the records of the entities, and he provided plaintiff with the QuickBooks records in 2012 and 2013. Defendant could not recall providing the records to plaintiff before 2012, and he had not told plaintiff that he kept track of the entities' transactions in QuickBooks before that point. Defendant did not prepare any formal reports for plaintiff for the entities defendant managed, but plaintiff did not ask him to do so. Plaintiff also did not ask defendant for financial records on any of their joint real estate development projects.

¶ 9        In each of the projects developed by defendant, both parties assumed a risk—plaintiff risked his money, and defendant risked his time and labor. While defendant's early projects were not successful, plaintiff kept investing with defendant "because he knew [defendant] was working hard, and he thought that [defendant] was just having bad luck and that the next project would work out for him with the incentive deals they had in place." At trial, plaintiff's expert calculated that plaintiff contributed at least $18.5 million to the entities managed by defendant, most of which was recorded by defendant as loans. Plaintiff's expert further calculated that defendant received "benefits" from these entities totaling at least $3.4 million during the time period in which defendant maintained the QuickBooks records.

¶ 10       In 2012, plaintiff began looking into defendant's management of the entities and related properties and hired Edward Reagan, president of Safe Harbor Realty (Safe Harbor), a property management company, to investigate. Reagan "discovered that [defendant] had mismanaged the entities and properties and benefitted from a number of transactions of which [plaintiff] had not been aware or authorized." For instance, Reagan discovered that a number of the

entities managed by defendant had been dissolved by the Secretary of State for failure to pay the required fees, that defendant had failed to pay real estate taxes or payroll taxes, and that there were significant deferred maintenance issues at several properties. Reagan also learned that defendant had leased the fourth floor of Lincoln to his solely owned entity, LES, which then collected rents from the fourth-floor tenants for his own personal use. He further discovered large unauthorized payments to defendant and to defendant's solely owned entities, as well as unauthorized loans among the various entities managed by defendant.

¶ 11  After Reagan's investigation, defendant turned over control of Timber Court, Lincoln, and Water Street to plaintiff at the end of 2012 and resigned his position at Tandem in August 2013. After defendant turned over control, Safe Harbor, Reagan's company, became the property manager of Timber Court, Lincoln, and Water Street. In 2013, Reagan retained an attorney to draft a separation agreement on behalf of plaintiff and the entities previously managed by defendant, on the understanding that plaintiff was turning over ownership and control of all of the entities other than Jackson. However, the parties could not reach an agreement over the terms of the separation agreement, and defendant filed suit against plaintiff in August 2013. Defendant also retook control over Timber Court on November 11, 2013, with the support of Timber Court's other two members, Barron Development LLC (Barron Development) and Howard Blair. Barron Development's affiliated property management company became the property manager, with defendant serving as a "consultant."

¶ 12                                  II. Litigation

¶ 13  On November 22, 2013, plaintiff filed suit against Timber Court and its members— defendant, Barron Development, and Howard Blair—in case No. 2013-CH-26214. This case

is the one at issue on appeal. Two other cases were later consolidated with case No. 2013-CH-26214, which we discuss only briefly to explain the procedural posture of the case before us.

¶ 14   First, on September 18, 2014, Timber Court, which was controlled by defendant at the time, filed suit in case No. 2014-L-9779 against plaintiff, plaintiff's wife, and Safe Harbor. This case was consolidated with case No. 2013-CH-26214, and the trial court later granted summary judgment to plaintiff in case No. 2014-L-9779, which resulted in plaintiff gaining control of Timber Court and the dissociation of defendant and Barron Development.[2] Additionally, plaintiff also requested the consolidation of a third case that had previously been filed against Lincoln, case No. 2013-L-11973, which was granted on December 30, 2014; in the order currently at issue on appeal, the trial court dismissed case No. 2013-L-11973 as moot, and no party challenges that dismissal. Finally, on July 31, 2015, 17 owners of condominium units at the condominium complex developed by Timber Court were permitted to intervene, but they did not proceed to trial on their claims, and in the order currently at issue on appeal, the trial court entered judgment against them for want of prosecution.

¶ 15   Turning to case No. 2013-CH-26214, as noted, plaintiff first filed suit on November 22, 2013. The operative complaint at the time of trial was plaintiff's fifth amended complaint, so we discuss plaintiff's prior complaints only briefly. The initial complaint contained four counts, all focused on Timber Court: (1) count I sought an accounting, (2) count II was for breach of fiduciary duty, (3) count III was for breach of contract, and (4) count IV sought an injunction ordering defendant to turn over possession of Timber Court's financial records to plaintiff. On December 31, 2013, defendant filed an answer and affirmative defenses. Among

_____

[2]Plaintiff also settled with Blair on August 10, 2015, which resulted in plaintiff's acquiring any ownership interest Blair had in Timber Court.

his affirmative defenses was the defense of *laches*, in which defendant claimed that, from the fourth quarter of 2012 until November 2013, plaintiff "had unfettered and complete control and access to Timber Court's books and records" but chose to refrain from filing suit for almost a year, which prejudiced defendant.

¶ 16     Plaintiff filed an amended complaint on January 31, 2014, amending count IV to now seek foreclosure of an equitable mortgage on Timber Court. On March 25, 2014, plaintiff filed a second amended complaint containing 10 counts, still focusing solely on Timber Court. On May 28, 2014, defendant filed an answer to the second amended complaint, again raising *laches* as an affirmative defense, containing identical allegations as in his affirmative defense to the original complaint.

¶ 17     On October 14, 2014, plaintiff filed a third amended complaint. While the third amended complaint, like the previous complaints, contained allegations concerning Timber Court, the third amended complaint for the first time added allegations of fraud and breach of fiduciary duty with respect to defendant's involvement in Lincoln, Water Street, Tandem, and CZ. As part of a fraud count, plaintiff alleged that defendant failed to disclose material facts to plaintiff about these entities, including (1) numerous unauthorized loans, disbursements, and cash transfers; (2) the mismanagement of Timber Court; (3) the improper diversion of funds to LES, defendant's solely owned entity; (4) the unauthorized and improper diversion of funds to Water Street Investment; (5) defendant's purchasing several units at Water Street at below-market rates; and (6) the unauthorized disbursements from CZ to defendant, while failing to make *pro rata* distributions to plaintiff. Plaintiff alleged that he reasonably relied on defendant to disclose to him all material facts and that defendant's omissions and misrepresentations damaged him.

¶ 18    On December 1, 2014, defendant filed an answer to the third amended complaint. Defendant did not assert any new defenses but merely provided: "Defendants hereby incorporate and stand on their previously pled affirmative defenses and counterclaims which [plaintiff] has answered." Defendant, along with Timber Court, also filed a motion to dismiss the third amended complaint. As to the fraud count, defendant alleged that the complaint failed to allege sufficiently specific facts to support a claim of fraud. The motion to dismiss did not seek dismissal of the breach of fiduciary duty count concerning Lincoln, Water Street, Tandem, and CZ and only alleged that the breach of fiduciary duty count concerning Timber Court did not contain sufficient facts to state a cause of action. The motion to dismiss was granted in part and denied in part, with the court finding that plaintiff had alleged sufficient facts to support a cause of action for fraudulent concealment and a cause of action for breach of fiduciary duty based on defendant's self-dealing.

¶ 19    On September 11, 2015, plaintiff filed a fourth amended complaint. As with the third amended complaint, the fourth amended complaint included counts for breach of fiduciary duty and fraud with respect to the entities managed by defendant. On October 30, 2015, defendant filed an answer, which did not allege any new affirmative defenses but again merely provided: "Defendants hereby incorporate and stand on their previously pled affirmative defenses and counterclaims which [plaintiff] has answered." Additionally, defendant sought to dismiss the complaint but only claimed that the count for breach of fiduciary duty concerning Timber Court failed to allege sufficient facts to state a cause of action. The motion to dismiss did not seek dismissal of the breach of fiduciary duty counts concerning the other entities and did not seek dismissal of the portion of the fraud count that alleged fraudulent concealment. The motion to dismiss was granted in part and denied in part, with the trial court finding that

plaintiff had sufficiently alleged facts stating a cause of action for breach of fiduciary duty with respect to Timber Court.

¶ 20    On January 16, 2016, plaintiff filed a fifth amended complaint, which contained a total of 16 counts and was the operative complaint at the time of trial. The counts that proceeded to trial were (1) count II, for breach of fiduciary duty against defendant and Barron Development with respect to Timber Court; (2) count IV, for fraudulent concealment against defendant with respect to Timber Court, Lincoln, Water Street, Tandem, and CZ; (3) count IX, for breach of fiduciary duty against defendant with respect to Tandem, Lincoln, Water Street, and CZ; (4) count X, for removal of defendant from Tandem; (5) count XII, for recoupment of attorney fees advanced to defendant and Barron Development pursuant to an indemnification provision in Timber Court's operating agreement; and (6) count XV, for breach of the operating agreement against defendant with respect to Lincoln.

¶ 21    On July 25, 2016, defendant filed an answer to the fifth amended complaint. As with his answers to the third and fourth amended complaints, defendant's answer to the fifth amended complaint did not assert any new affirmative defenses but merely provided: "Defendants hereby incorporate and stand on their previously pled affirmative defenses and counterclaims which [plaintiff] has answered."

¶ 22                          III. Trial and Court's Findings

¶ 23    A bench trial on plaintiff's fifth amended complaint began on December 3, 2018, and concluded on December 12, 2018. A total of 13 witnesses testified concerning defendant's management of the various entities owned and managed by defendant, and as noted, there are no challenges to the trial court's factual findings, other than a claim that its findings were internally inconsistent. An overview of the trial court's factual findings is set forth above, in

our discussion of the facts leading to the instant litigation, so we focus here on the court's conclusions of law as to the counts that proceeded to trial. We discuss each count in the order that the trial court did, focusing on the counts relevant to the instant appeal.

¶ 24                      A. Count II: Breach of Fiduciary Duty

¶ 25      Count II was for breach of fiduciary duty against defendant and Barron Development with respect to Timber Court. The court found that defendant and Barron Development owed plaintiff fiduciary duties both pursuant to the terms of Timber Court's operating agreement and under Illinois law. The court found that defendant breached his fiduciary duties to plaintiff by paying himself $395,000 in unauthorized development fees from Timber Court's funds in 2005-06. The court found that such fees were not authorized under the operating agreement and found that these fees had not been disclosed to plaintiff at the time. The trial court also found that defendant had breached his fiduciary duties to plaintiff by issuing $35,000 in unauthorized checks from Timber Court's funds that he could not explain and by paying himself $45,153 from Timber Court's funds that he could not explain.

¶ 26      The trial court further found that defendant and Barron Development had violated their fiduciary duties to plaintiff when they entered into a property management agreement with Barron Development's affiliated property management company and by causing defendant to be hired as a consultant. The court found that the rate of payment to the property management company was unreasonably high and that the consulting agreement paid defendant $2500 per month "for little work that benefitted Timber Court." The court further found that defendant and Barron Development violated their fiduciary duties to plaintiff by causing Timber Court to pay defendant leasing commissions because such commissions were not authorized by the operating agreement, there was no other written agreement providing for the payment of

commissions, and Timber Court's onsite manager handled nearly all of the work of leasing Timber Court's units. The court found that defendant and Barron Development had failed to prove that the property management fees, consulting payments, and leasing commissions were fair and reasonable to Timber Court and plaintiff and found that the total amount of these fees was $226,428. The court noted that plaintiff was especially injured by these breaches because Timber Court was insolvent and could not repay plaintiff's loans and the amounts defendant and Barron Development wrongfully diverted were funds that should have been used to repay plaintiff's loans.

¶ 27    Finally, the court found that defendant breached his fiduciary duty by mismanaging Timber Court, including by failing to pay bills in a timely fashion, failing to pay property and payroll taxes, and allowing Timber Court to be involuntarily dissolved by the Secretary of State. The court further found that defendant wrongfully diverted to himself or to his entities the self-dealing payments that we have explained in previous paragraphs.

¶ 28    As damages, the court found that defendant's and Barron Development's breaches of their fiduciary duties "were sufficiently egregious to warrant a complete forfeiture of all benefits that they received." The court found that plaintiff had suffered compensatory damages in the total amount of $701,581.50. The court further found that Barron Development was jointly and severally liable for the breaches involving the property management fees and defendant's leasing commissions, in the total amount of $226,428.50. The court also ordered defendant to disgorge all commissions and management fees paid to himself or to his solely owned entities from the funds of Timber Court, in the amount of $236,887. Finally, the court found that defendant and Barron Development had previously been dissociated from Timber Court in April 2018 following summary judgment on several counts of the complaint. However, the

court found that, "[i]f that ruling is overturned on appeal," defendant and Barron Development should be expelled from Timber Court for their breaches of fiduciary duty.

¶ 29                                    B. Count IX: Breach of Fiduciary Duty

¶ 30        Count IX was against defendant for breach of fiduciary duty with respect to Tandem, Lincoln, Water Street, and CZ. While the trial court separately discussed each entity, we provide an overview of the court's findings more generally.

¶ 31        The court found that defendant owed plaintiff fiduciary duties with respect to each entity, pursuant to each entity's operating agreement and under Illinois law. However, the court found that defendant breached these fiduciary duties in several ways.

¶ 32        First, the court found that defendant breached his fiduciary duties by paying himself fees that were not authorized by the entities' operating agreements and to which plaintiff did not consent. Specifically, defendant distributed $60,000 from Lincoln to himself as a development fee and caused Water Street to pay defendant's solely owned entities (Water Street Investment and Tandem Investments) development fees of $210,000 and $462,000, respectively. Defendant also paid himself $31,688 from Lincoln that he could not explain.

¶ 33        Next, the court found that defendant made distributions to himself in cash, without making those same distributions to plaintiff. With respect to Lincoln, defendant distributed $32,000 in cash to himself, while listing plaintiff's $32,000 as a loan from plaintiff to Timber Court, which the trial court found was "involuntary and unapproved." Similarly, defendant paid himself $47,500 in cash distributions from Water Street between 2006 and 2012, without paying plaintiff his *pro rata* share in cash, instead recording increases to plaintiff's loan accounts without informing plaintiff. With respect to CZ, defendant distributed $54,500 in cash to himself from CZ and recorded a $54,500 as a loan back to CZ from plaintiff.

¶ 34    The court also found that defendant transferred funds between the various entities without authorization. For instance, defendant caused CZ to pay $18,625 to Jackson and recorded that as a decrease in plaintiff's loan to CZ. Additionally, defendant distributed $57,000 from Tandem to his solely owned entity, Tandem Investments, and recorded it as a " 'loan' " to Water Street.

¶ 35    Additionally, the court found that defendant engaged in conduct that personally benefited himself. With respect to Lincoln, the court found that defendant breached his fiduciary duties by secretly creating LES to siphon the rents from the fourth floor of the property owned by Lincoln and causing LES to pay him $554,062 in " 'owner draw' " payments between 2005 and 2012. The court did not find credible defendant's justification for the creation of LES, finding that "the evidence showed that the LES transaction was not at arm's length because [defendant] was on both sides, and LES simply diverted tenants and corporate opportunities— and therefore rent payments—that belonged to Lincoln." The court further found that "LES did not pay all the rent owed under the lease, let alone market rents, and therefore [defendant's] 'owner's draw' payments to himself from LES diverted funds that properly belonged to Lincoln."

¶ 36    Furthermore, with respect to Lincoln, defendant on one occasion obtained a $10,000 personal credit toward a sectional sofa in lieu of back rent that a furniture store owed to Lincoln. With respect to Tandem, defendant paid himself automobile expenses in the amount of $68,993.60 from Tandem's funds. Defendant also paid LES rent in the amount of $31,676 from Tandem's funds for an office that defendant used for personal use. With respect to Water Street, the court found that defendant secretly purchased four of Water Street's units for himself at a discount; the court found that the discounts totaled $302,230. Defendant also paid

himself a $16,700 commission for selling one of the units to himself; rented one of the units back to Water Street for use as a model apartment and pocketed the rent of $24,700 for himself; and used Water Street's funds for maintenance expenses, condominium association fees, legal fees, and insurance fees for the units he owned personally.

¶ 37    Finally, the trial court found that defendant also breached his fiduciary duties by mismanaging the properties that the various entities owned or managed. With respect to Lincoln, the court found that defendant breached his fiduciary duties by mismanaging Lincoln, including by failing to pay bills on time and failing to maintain important building systems. The court found that defendant "caused Lincoln to under-invest in regular maintenance and upkeep while wrongfully diverting to himself or his entities the self-dealing payments listed above." Defendant's breaches diverted funds that were necessary for the property's upkeep, requiring plaintiff to "infuse" over $444,000 in additional funds into Lincoln between 2013 and 2017 to make necessary repairs. Similarly, with respect to Water Street, the court found that defendant breached his fiduciary duty by "grossly mismanaging" Water Street, including by causing liens to be placed on units for failing to pay assessments and by failing to pay real estate taxes in a timely manner. The court found that defendant "caused Water St. to miss these payments while wrongfully diverting to himself or his entities the self-dealing payments."

¶ 38    As damages, the court found that defendant's breaches of fiduciary duty with respect to each entity were "sufficiently egregious to warrant a complete forfeiture of all benefits that he received." As to Lincoln, the court found that defendant's breaches had cost plaintiff $687,730 in compensatory damages diverted from Lincoln that plaintiff would not be able to recover from Lincoln, ordered defendant to disgorge all commissions and management fees paid to himself or to his solely owned entities from Lincoln's funds, in the amount of $88,146, and

ordered his expulsion from Lincoln. As to Water Street, the court found that defendant's breaches cost plaintiff $1,063,170 in compensatory damages diverted from Water Street's funds and also ordered defendant to disgorge all commissions and management fees paid to himself or to his solely owned entities from Water Street's funds, in the amount of $18,070. As to CZ, the court found that defendant's breaches caused plaintiff $73,125 in damages and also ordered that defendant be expelled as a partner in CZ. Finally, as to Tandem, the court found that defendant's breaches caused plaintiff damages in the amount of $157,669.60. The court found that defendant had resigned his position as president of Tandem in 2012 and did not presently hold any officer position with Tandem but found that defendant should be removed as an officer and director. Finally, the court found that, "[a]s a remedy for [defendant's] persistent looting of Tandem," defendant was ordered to disgorge his 50% interest in the company.

¶ 39                              C. Count IV: Fraud

¶ 40        Count IV was against defendant for fraud with respect to Timber Court, Lincoln, Water Street, Tandem, and CZ. In setting out the legal standard, the trial court noted that a claim for fraudulent concealment required the plaintiff to prove justified reliance on the defendant's alleged concealment. The court found that plaintiff's claim failed because he was unable to prove justified reliance, finding that "[h]ad [plaintiff] exercised ordinary diligence over the course of his decades-long real estate development partnership with [defendant] he would have easily discovered [defendant's] wrongdoing." However, the court found that while defendant had contemporaneously recorded the money he took, plaintiff "never bothered to examine the books and records" of the entities defendant managed. The court noted that the failure to inquire was particularly significant because the real estate development projects that they

15

partnered on failed, and plaintiff was "highly successful and sophisticated in business." The court found that "the *only* reason [defendant] was able to commit defalcations for more than two decades is because [plaintiff] did nothing to monitor his joint investments with [defendant]." (Emphasis in original.)

¶ 41   The court further found that plaintiff "did nothing when he learned of [defendant's] defalcations," noting that plaintiff did not request the QuickBooks records until late 2012, long after he learned about some of the fees that defendant was paying himself. The court also noted that defendant did nothing to prevent plaintiff from discovering his conduct, all of which was recorded. The court found that "[t]he law does not permit [plaintiff] to claim fraud when he failed to make reasonable inquiry into his joint investments with [defendant], and [defendant] did nothing to prevent [plaintiff] from ascertaining the truth of his defalcations." Accordingly, the trial court entered judgment in defendant's favor on the fraud count.

¶ 42                                D. Punitive Damages

¶ 43   The court then considered whether punitive damages were appropriate with respect to counts II and IX, the counts concerning breaches of fiduciary duty. The court found that defendant's self-dealing fiduciary breaches warranted punitive damages. Additionally, the court found that punitive damages were appropriate due to defendant's "egregious conduct" in several other instances.

¶ 44   First, the court found that, in 2016, defendant gave his law firm at the time a security interest in the real estate owned by Timber Court as security for defendant's outstanding legal bills. Defendant did so despite the fact that the parties were involved in litigation at the time and in violation of a January 12, 2014, "Protocol for Special Administrator" order (protocol order) that set forth a process that Timber Court and defendant were required to follow before

Timber Court could pay any of Timber Court's or defendant's legal fees.[3] The court found that there was no corporate resolution or document authorizing defendant to have a mortgage placed on Timber Court's real estate and that plaintiff and Barron Development did not know about the mortgage until they learned about it through counsel after the fact. The court found that the mortgage transaction "constituted an attempted end-run around the Protocol Order and violated that order."

¶ 45    In support of an award of punitive damages, the court also pointed to a February 2015 common interest agreement with Timber Court's unit owners in which defendant purported to agree on behalf of Timber Court never to " 'deconvert' " the condominium units into rental units without the agreement of the other unit owners, despite defendant's acknowledgment that deconversion made financial sense for the project. Most of these unit owners subsequently intervened in the instant litigation. Finally, the court pointed to "various intercompany loans among [the entities managed by defendant] and other entities, including Jackson" in support of a punitive damages award.

¶ 46    The court noted that plaintiff sought treble damages due to defendant's "egregious self-dealing" but found that treble damages were excessive, given that the court had ordered complete forfeiture of everything defendant took during the period of his breach. The court noted that one purpose of punitive damages is to deter wrongful conduct and that it viewed forfeiture "as a type of punitive damage." The court found that "[w]hen a fiduciary is ordered to forfeit all benefits he received, as [defendant] and Barron [Development] are ordered to here,

---

[3]The Timber Court operating agreement contained an indemnification provision that was the basis for Timber Court's payment of the attorney fees.

there is some element of a windfall to the beneficiary. Thus, complete forfeiture of management fees is already punitive."

¶ 47   The court further found that "the credible evidence shows that [plaintiff] knew about at least some of [defendant's] self-help payments but did not object." The court also found that plaintiff "did not deal fairly with [defendant] in at least one instance," noting that at trial, plaintiff indicated that he planned to pursue a loan to defendant that had previously been forgiven. Consequently, the court imposed single (1:1) punitive damages against defendant as a result of his breaches.

¶ 48                 E. Summary of Trial Court's Findings and Award of Damages

¶ 49   In sum, the trial court's findings are as follows:

¶ 50   With respect to count II, for breach of fiduciary duty against defendant and Barron Development with respect to Timber Court, the trial court entered judgment in favor of plaintiff. The total judgment against defendant was in the amount of $938,468.50, and the judgment against Barron Development was $226,428.50.

¶ 51   With respect to count IV, for fraudulent concealment against defendant with respect to Timber Court, Lincoln, Water Street, Tandem, and CZ, the trial court entered judgment in favor of defendant.

¶ 52   With respect to count IX, for breach of fiduciary duty against defendant with respect to Tandem, Lincoln, Water Street, and CZ, the court entered judgment in favor of plaintiff. The total judgment against defendant was in the amount of $2,087,910.60. The trial court also ordered defendant's expulsion from Lincoln and CZ and ordered defendant to disgorge his 50% interest in Tandem.

¶ 53    With respect to count X, for removal of defendant from Tandem, the court entered judgment in favor of plaintiff.

¶ 54    With respect to count XII, for recoupment of attorney fees advanced to defendant and Barron Development pursuant to the indemnification provision in Timber Court's operating agreement, the court entered judgment in favor of plaintiff. The court ordered defendant to repay to Timber Court $562,154.54 in attorney fees paid on defendant's behalf, and ordered Barron Development to repay to Timber Court $250,084.33 in attorney fees paid on Barron Development's behalf.

¶ 55    With respect to count XV, for breach of the operating agreement against defendant with respect to Lincoln, the court entered judgment in favor of plaintiff. The court entered judgment against defendant in the amount of $687,730 but found that these damages were concurrent to, and not cumulative to, the damages awarded with respect to defendant's breaches of fiduciary duty.

¶ 56    The court also awarded punitive damages in the amount of $2,664,651.10, and awarded prejudgment interest of 5%, which totaled $1,466,692.60.

¶ 57    The trial court entered a total judgment in favor of plaintiff and against defendant in the amount of $7,719,877.34.

¶ 58    The court also entered judgment in favor of plaintiff and against Barron Development in the amount of $476,512.83, with the $226,428.50 judgment on count II being joint and several with defendant.

¶ 59    Finally, the court dismissed case No. 14-L-9779 against the 17 intervening unit owners and dismissed as moot case No. 13-L-11973.

¶ 60                               IV. Motion to Amend Pleadings

¶ 61        On October 16, 2019, defendant filed a motion for reconsideration, which was amended on October 29, 2019. As part of his motion for reconsideration, defendant argued that the trial court erred because it "failed to adjudicate" defendant's affirmative defense of *laches* and that all transactions prior to November 22, 2008, should be precluded on the basis of *laches*.

¶ 62        On October 29, 2019, defendant filed a motion for leave to file an affirmative defense to conform his pleadings to the proofs at trial pursuant to section 2-616 of the Code of Civil Procedure (Code) (735 ILCS 5/2-616 (West 2018)). Defendant sought to add a statute of limitations defense, contending that plaintiff's claims were time-barred. Defendant claimed that plaintiff would not be prejudiced by such an amendment, as defendant's *laches* defense also addressed the issue of timeliness and the dates of the allegedly wrongful transactions were uncontroverted.

¶ 63        On October 30, 2019, the trial court denied defendant's motion to amend his pleadings.

¶ 64        On November 26, 2019, in response to defendant's motion for reconsideration, plaintiff claimed that defendant had failed to advance his affirmative defenses at trial or in posttrial briefing and that, even if properly presented, his *laches* defense would have failed. In his reply, defendant contended that he had established the elements of his *laches* defense.

¶ 65        On January 7, 2020, defendant filed a motion for leave to amend his *laches* defense to conform to the proofs at trial pursuant to section 2-616 of the Code.

¶ 66        On January 16, 2020, the trial court denied defendant's motion for leave to amend his defense.

¶ 67   Finally, on January 21, 2020, the trial court denied defendant's motion for reconsideration. Defendant filed a notice of appeal on February 18, 2020, and this appeal follows.[4]

¶ 68                                ANALYSIS

¶ 69   On appeal, defendant claims that the trial court erred in denying his motion to amend his pleadings to permit defendant to raise the statute of limitations and *laches* as defenses. Defendant also claims that the trial court's opinion was internally inconsistent, and that the court erred in awarding punitive damages.

¶ 70                         I. Amendment of Pleadings

¶ 71   Defendant first claims that the trial court erred in denying his motion to amend his pleadings. Section 2-616(c) of the Code provides that "[a] pleading may be amended at any time, before or after judgment, to conform the pleadings to the proofs." 735 ILCS 5/2-616(c) (West 2018). Section 2-616(c) is to be liberally construed so that cases are decided on their merits, not on procedural technicalities. *Pry v. Alton & Southern Ry. Co.*, 233 Ill. App. 3d 197, 213 (1992). However, where an amendment is made to conform the pleadings to the proof, the amendment will not be allowed unless the evidence already produced supports the amendment. *Pry*, 233 Ill. App. 3d at 213. The decision to allow an amendment to a pleading rests within the sound discretion of the trial court, and we will not reverse the trial court's decision absent an abuse of that discretion. *Axion RMS, Ltd. v. Booth*, 2019 IL App (1st) 180724, ¶ 26. "A trial court abuses its discretion when no reasonable person would take the view adopted by the trial court." *Axion RMS*, 2019 IL App (1st) 180724, ¶ 26. To determine whether a trial court has abused its discretion, we look to the four factors set out by our supreme court: "(1) whether the proposed amendment would cure the defective pleading; (2) whether other parties would

_____

[4]Plaintiff filed a notice of cross-appeal on February 28, 2020, but later withdrew the cross-appeal.

sustain prejudice or surprise by virtue of the proposed amendment; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading could be identified." *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273 (1992).

¶ 72    In the case at bar, we cannot find that the trial court abused its discretion in denying defendant leave to amend his answer to assert defenses based on the statute of limitations and *laches*. Defendant spends much of his brief focused on the first factor, whether the defenses would have been successful. However, we need not decide whether the defenses would have been successful because the other three factors weigh strongly against permitting amendment, so we cannot find that the trial court's denial of defendant's motions was an abuse of discretion.

¶ 73    As to timeliness, the amendment occurred after trial—indeed, after the trial court's judgment. Moreover, defendant had numerous opportunities to amend his defenses prior to that point. Plaintiff filed a total of six complaints—the original complaint and five amendments— and defendant could have asserted his defenses at any of those times. Instead, defendant waited until the last possible moment to raise his defenses. This delay was also prejudicial to plaintiff because it deprived him of any ability to provide evidence as to these defenses.

¶ 74    Defendant claims that he could not have raised his defenses any earlier because it was not until the trial court entered judgment in his favor on the fraud count that he was able to raise a statute of limitations defense. We do not find this argument persuasive. Defendant's argument is premised on the theory that "the very nature of affirmative defenses requires the court to view a plaintiff's allegation as true," so defendant was unable to raise a statute of limitations defense so long as there was a count for fraudulent concealment asserted by plaintiff. However, this argument improperly conflates the requirements of an affirmative claim of fraud with the requirements for tolling a statute of limitations due to fraudulent concealment.

22

¶ 75 In Illinois, common law fraud includes claims of fraudulent misrepresentation. *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 703 (2002). The concealment of a fact may be actionable as a fraudulent misrepresentation. *Schrager*, 328 Ill. App. 3d at 706. In order to show fraudulent concealment, a plaintiff must prove "that the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 500 (1996). A duty to disclose a material fact can arise under several circumstances, including when plaintiff and defendant "are in a fiduciary or confidential relationship" or in a situation where "plaintiff places trust and confidence in defendant, thereby placing defendant in a position of influence and superiority over plaintiff. [Citations.] This position of superiority may arise by reason of friendship, agency, or experience." *Connick*, 174 Ill. 2d at 500.

¶ 76 "[I]n order for a plaintiff to prove that the concealment of a fact was a fraudulent misrepresentation, he must prove: '(1) the concealment of a material fact; (2) the concealment was intended to induce a false belief, under circumstances creating a duty to speak [citation]; (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury.' " *Schrager*, 328 Ill. App. 3d at 706-07 (quoting *Stewart v. Thrasher*, 242 Ill. App. 3d 10, 16 (1993)).

¶ 77 By contrast, fraudulent concealment in the context of the statute of limitations means that the statute of limitations will be tolled if the plaintiff pleads and proves that fraud prevented discovery of the cause of action. *Henderson Square Condominium Ass'n v. LAB Townhomes,*

23

*LLC*, 2015 IL 118139, ¶ 36. Under section 13-215 of the Code, "[i]f a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards." 735 ILCS 5/13-215 (West 2018). Generally, "the concealment necessary to toll the statute of limitations must consist of affirmative acts or representations calculated to lull or induce a plaintiff into delaying the filing of his claim or preventing him from discovering the claim." *Henderson Square*, 2015 IL 118139, ¶ 38 (citing *Orlak v. Loyola University Health System*, 228 Ill. 2d 1, 18 (2007)). In the context of the statute of limitations, the fraudulent concealment is not a cause of action in and of itself but is "an exception to the limitations period imposed on other, underlying causes of action." *Doe No. 2 v. Boy Scouts of America*, 2016 IL App (1st) 152406, ¶ 80 (citing *Cangemi v. Advocate South Suburban Hospital*, 364 Ill. App. 3d 446, 459 (2006)).

¶ 78        In the case at bar, there is nothing that prevented defendant from raising a statute of limitations defense merely because plaintiff alleged that defendant had fraudulently concealed his actions in managing the various entities. Even if defendant were required to admit the truth of plaintiff's factual allegations, tolling of the statute of limitations would not automatically follow, unless plaintiff was able to establish that defendant's actions concealed *the cause of action* itself. See *Henderson Square*, 2015 IL 118139, ¶ 36. Moreover, the statute of limitations is not tolled under section 13-215 when the plaintiff could have discovered the concealed information through ordinary diligence. *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 676 (1997). Thus, even if defendant felt bound by plaintiff's allegations, he nevertheless could have raised the statute of limitations defense by claiming that plaintiff should have discovered his causes of action earlier. We simply find no support

for defendant's suggestion that plaintiff included the fraud count purposely to prevent defendant from asserting a statute of limitations defense, as that defense could have been raised earlier.

¶ 79    We are similarly unpersuaded by defendant's contention that plaintiff could not have been prejudiced because defendant had, in fact, asserted a *laches* defense. This argument completely misrepresents the nature of defendant's *laches* defense. The defense, which was first raised in response to plaintiff's original complaint, alleged that, from the fourth quarter of 2012 until November 2013, plaintiff "had unfettered and complete control and access to Timber Court's books and records" but chose to refrain from filing suit for almost a year, which prejudiced defendant. In other words, defendant's *laches* defense alleged that the "clock" on the causes of action involving Timber Court should have started in the fourth quarter of 2012. Defendant's defense contains absolutely no allegations that plaintiff should have discovered defendant's self-dealing prior to 2012, as he now argues. We also note that, even though plaintiff amended his complaint five times, resulting in six complaints in all, defendant never updated his defense to address the new allegations. Indeed, in his last three answers, defendant merely provided: "Defendants hereby incorporate and stand on their previously pled affirmative defenses and counterclaims which [plaintiff] has answered." Defendant did so despite the fact that those three complaints—the third, fourth, and fifth amended complaints—included for the first time allegations concerning entities other than Timber Court. Defendant also did not raise his *laches* defense at trial or in posttrial briefing. Defendant's contention that plaintiff was on notice that the timeliness of the claims were at issue is therefore completely unsupported by the factual record.

¶ 80    Finally, we find unpersuasive defendant's reliance on cases that he claims are similar to the case at bar, as none of the cases cited by defendant bear any relation to the situation present here. For instance, in *Miller v. Pinnacle Door Co.*, 301 Ill. App. 3d 257, 258 (1998), the plaintiff was injured when operating a garage door opener installed by the defendant and filed a lawsuit alleging negligence. During trial, and prior to the plaintiff resting her case, the defendant was granted leave to amend its pleadings to assert a defense of contributory negligence. *Miller*, 301 Ill. App. 3d at 258. On appeal, the appellate court agreed with the trial court that the plaintiff was not surprised by the amendment because it was her conduct and her testimony that gave rise to the contributory negligence defense. *Miller*, 301 Ill. App. 3d at 261.

¶ 81    Additionally, in *Mapes v. Kalva Corp.*, 68 Ill. App. 3d 362, 364 (1979), the plaintiff filed a lawsuit against the defendant for breach of an employment contract. During trial, the plaintiff's evidence showed that the plaintiff did not have any proof of a written contract, and, at the close of the plaintiff's case-in-chief, the defendant filed a motion to amend his answer to include a defense based on the statute of frauds, which the trial court denied. *Mapes*, 68 Ill. App. 3d at 365. On appeal, the appellate court reversed the trial court, finding that the trial court abused its discretion in denying leave to amend because the complaint that proceeded to trial had alleged facts to which the statute of frauds would not apply, meaning that it was not until after plaintiff had presented his case that the defendant was in a position to assert the defense. *Mapes*, 68 Ill. App. 3d at 366-67. The appellate court also noted that the defendant had raised the defense in a motion to dismiss an earlier version of the plaintiff's complaint and that the plaintiff's attorney admitted that he was not surprised that the issue was raised during trial. *Mapes*, 68 Ill. App. 3d at 367.

¶ 82    In the case at bar, however, there was little indication prior to trial, or during trial, that the timeliness of plaintiff's claims would be at issue. While defendant raised the defense of *laches* in his affirmative defenses, as explained above, that defense was narrow, concerning only the allegation that plaintiff should have known about defendant's conduct with respect to Timber Court no later than the end of 2012. Defendant never expanded that defense to include any allegations that plaintiff should have known about defendant's self-dealing prior to 2012, nor did he ever include allegations about any entity other than Timber Court. Defendant also did not raise the defense during the trial itself, presenting no evidence concerning the timeliness issue and making no arguments on the issue. Thus, for all intents and purposes, defendant abandoned the issue of timeliness. Moreover, the theory on which plaintiff proceeded to trial did not change during the trial, as in *Mapes*, meaning that defendant was well able to raise his defenses prior to trial. Consequently, we cannot find that defendant's cases suggest that the trial court abused its discretion in the case at bar, and accordingly, we find that the trial court did not abuse its discretion in denying defendant leave to amend his answer to include the new affirmative defenses.[5]

¶ 83                                II. Inconsistent Findings

¶ 84    Defendant next claims that the trial court's judgment was against the manifest weight of the evidence because its findings were inconsistent. In a bench trial, the trial court has the opportunity to weigh the evidence and make findings of fact, and a reviewing court will defer to the findings of the trial court unless they are against the manifest weight of the evidence. *Eychaner v. Gross*, 202 Ill. 2d 228, 251 (2002). "A decision is against the manifest weight of

---

[5]We note that defendant also cites *Luciani v. Bestor*, 106 Ill. App. 3d 878 (1982). In his reply brief, defendant explains that he cited this case to show that amendment of the complaint could be made even at the appellate level. However, this case adds nothing to defendant's argument, as no motion for leave to amend was even made in that case.

the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner*, 202 Ill. 2d at 252. "A reviewing court should not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the fact finder." *Bazydlo v. Volant*, 164 Ill. 2d 207, 214 (1995). A reviewing court has only a cold record in which to govern its decision-making process. See *Racky v. Belfor USA Group, Inc.*, 2017 IL App (1st) 153446, ¶ 107. Accordingly, " '[t]he court on review must not substitute its judgment for that of the trier of fact.' " *Eychaner*, 202 Ill. 2d at 252 (quoting *Kalata v. Anheuser-Busch Cos.*, 144 Ill. 2d 425, 434 (1991)).

¶ 85     In the case at bar, defendant claims that the trial court's findings as to the fraud count and its findings as to the breach of fiduciary duty counts were inconsistent. Specifically, he claims that the trial court's findings as to plaintiff's diligence when analyzing the fraud count mean that plaintiff's breach of fiduciary duty counts should have failed, as well.

¶ 86     As noted, to prove his fraud count, plaintiff was required to prove (1) the concealment of a material fact; (2) the concealment was intended to induce a false belief, under circumstances creating a duty to speak; (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist; (4) the concealed information was such that the injured party would have acted differently had he been aware of it; and (5) that reliance by the person from whom the fact was concealed led to his injury. *Schrager*, 328 Ill. App. 3d at 706-07. The trial court found that plaintiff had failed to prove the element of justified reliance, finding that plaintiff would have been able to discover defendant's wrongdoing if plaintiff had exercised ordinary diligence. The court further found

that "the *only* reason [defendant] was able to commit defalcations for more than two decades is because [plaintiff] did nothing to monitor his joint investments with [defendant]." (Emphasis in original.)

¶ 87    With respect to the breach of fiduciary duty counts, plaintiff was required to prove (1) that a fiduciary duty existed, (2) that the fiduciary duty was breached, and (3) that the breach caused the injury of which plaintiff complains. *Neade v. Portes*, 193 Ill. 2d 433, 444 (2000). Defendant contends that the trial court's finding that "the *only* reason [defendant] was able to commit defalcations for more than two decades is because [plaintiff] did nothing to monitor his joint investments with [defendant]" (emphasis in original) when discussing the fraud claim means that plaintiff could not establish causation with respect to his fiduciary duty claims. Instead, defendant claims that the trial court's finding showed that plaintiff was the intervening cause of his own injury. We do not find this argument persuasive.

¶ 88    First, diligence is not an element of a breach of fiduciary duty claim, so a finding that plaintiff was not diligent in monitoring his accounts does not preclude the fiduciary duty claim. Additionally, fraud claims are subjected to a heightened pleading standard, requiring proof by clear and convincing evidence (*Schrager*, 328 Ill. App. 3d at 703), meaning that the trial court's findings as to the fraud count merely indicate that plaintiff's evidence did not rise to this level. Most importantly, defendant's argument misses the point of the trial court's findings and would lead to an entirely absurd result if we accepted it. In its findings on the fraud count, the trial court was simply saying that if plaintiff had been paying attention, *plaintiff could have stopped defendant's wrongdoing* at a much earlier point. That is a far cry from finding that plaintiff caused his own injury. Under defendant's theory, it is not his egregious self-dealing that caused

plaintiff harm, but plaintiff's own ignorance. This is not an argument the law can accept, and it has no basis in the trial court's findings.

¶ 89   Moreover, " '[t]he test that should be applied in all cases in determining the question of proximate cause is whether the first wrongdoer might have reasonably anticipated the intervening cause as a natural and probable result of the first party's own [wrongdoing].' " *Janowiak v. Tiesi*, 402 Ill. App. 3d 997, 1011 (2010) (quoting *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 317 (1942)); see also *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257 (1999) ("The test that should be applied in all proximate cause cases is whether the first wrongdoer reasonably might have anticipated the intervening efficient cause as a natural and probable result of the first party's own negligence."). In the case at bar, defendant could have reasonably anticipated that plaintiff would have relied on defendant's keeping him informed as to the various entities, given the parties' fiduciary relationship and the fact that the entities were under defendant's management and plaintiff merely supplied the funds. Defendant—as the individual maintaining the records—also would have been aware that plaintiff had not requested the records, meaning that defendant would have had knowledge that plaintiff was not inspecting the records of the various entities and was therefore relying on defendant's honesty. Accordingly, we cannot find that any lack of diligence on plaintiff's part would rise to the level of being an intervening cause so as to break the chain of causation. Therefore, we cannot find that the trial court's findings on the breach of fiduciary duty claims were against the manifest weight of the evidence.

¶ 90                                  III. Punitive Damages

¶ 91   Finally, defendant claims that the trial court erred in awarding plaintiff punitive damages. "[W]hen one breaches a fiduciary duty to a principal the appropriate remedy is within the

equitable discretion of the court." *In re Marriage of Pagano*, 154 Ill. 2d 174, 190 (1992). Punitive damages awards are permitted for a breach of a fiduciary duty. *Tully v. McLean*, 409 Ill. App. 3d 659, 670 (2011). "Punitive damages 'are not awarded as compensation, but serve instead to punish the offender and to deter that party and others from committing similar acts of wrongdoing in the future.' " *Slovinski v. Elliott*, 237 Ill. 2d 51, 57-58 (2010) (quoting *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 414 (1990)). They may be awarded "when the defendant's tortious conduct evinces a high degree of moral culpability, that is, when the tort is 'committed with fraud, actual malice, deliberate violence or oppression, or when the defendant acts willfully, or with such gross negligence as to indicate a wanton disregard of the rights of others.' " *Slovinski*, 237 Ill. 2d at 58 (quoting *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978)). "To determine whether punitive damages are appropriate, 'the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.' " *Slovinski*, 237 Ill. 2d at 58 (quoting Restatement (Second) of Torts § 908(2) (1979)). However, because they are penal in nature, punitive damages are not favored under the law, and courts must take caution to ensure that they are not improperly or unwisely awarded. *Slovinski*, 237 Ill. 2d at 58.

¶ 92    In the case at bar, defendant does not challenge the imposition of punitive damages in itself but challenges the amount of the punitive damages award. "The amount of the award should be a reflection of the court's determination as to the degree of maliciousness evidenced by defendants' actions." *Tully*, 409 Ill. App. 3d at 673 (citing *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 69 (2009)). We review the computation of the punitive damages award "to determine whether the amount was excessive or the result of passion, partiality, or

corruption." *Gambino*, 398 Ill. App. 3d at 69 (citing *Franz v. Calaco Development Corp.*, 352 Ill. App. 3d 1129, 1138 (2004)). "In reviewing [the] determination of the amount of punitive damages, if any, we will reverse only if the award was so excessive [as] to indicate passion, partiality, or corruption." (Internal quotation marks omitted.) *Gambino*, 398 Ill. App. 3d at 69. The assessment of punitive damages is a highly factual decision and, as noted, should be a reflection of the factfinder's determination as to the degree of maliciousness evidenced by a defendant's actions. *Gambino*, 398 Ill. App. 3d at 69.

¶ 93    In the case at bar, the trial court found that defendant's self-dealing fiduciary breaches warranted punitive damages. Additionally, the court found that punitive damages were appropriate due to defendant's "egregious conduct" in several other instances, including an unauthorized mortgage of Timber Court to pay defendant's legal fees, entering into a common interest agreement with Timber Court's unit owners, and making several intercompany loans between the various entities. However, the court found that the award of treble damages sought by plaintiff was excessive, and instead imposed "single (1:1) punitive damages."

¶ 94    Defendant claims that the trial court's award of punitive damages was excessive because the trial court did not consider defendant's net worth in setting the amount. He claims that he "did not have a substantial net worth at all," which indicated that the trial court's award was the result of passion or prejudice. We do not find this argument persuasive.

¶ 95    First, defendant has forfeited this argument by failing to raise it before the trial court, either at trial or at any point after trial. See *Susman v. North Star Trust Co.*, 2015 IL App (1st) 142789, ¶¶ 41-42 (refusing to consider argument raised for the first time on appeal). Additionally, defendant did not present any evidence as to his net worth; the only evidence presented at trial was that defendant's early ventures with plaintiff were unsuccessful and defendant did not earn

significant income from that work. Finally, the trial court did, in fact, impose a lower punitive damages award than was sought by plaintiff, indicating that it carefully weighed the evidence to determine the appropriate amount of the award. Accordingly, we cannot find that the punitive damages award "was so excessive [as] to indicate passion, partiality, or corruption." (Internal quotation marks omitted.) *Gambino*, 398 Ill. App. 3d at 69.

¶ 96                                    CONCLUSION

¶ 97        For the reasons set forth above, we affirm the trial court's judgment. First, the trial court properly denied defendant leave to amend his answer to assert defenses based on the statute of limitations and *laches*, where defendant first attempted to raise those defenses after the trial court had issued its judgment. Second, the trial court's findings were internally consistent and the trial court properly found that defendant had breached his fiduciary duties despite also finding that plaintiff had not established his fraud claim. Finally, the trial court's award of punitive damages was not excessive or the result of passion or prejudice.

¶ 98        Affirmed.

No. 1-20-0338

| | |
|---|---|
| **Cite as:** | *Cahnman v. Timber Court LLC*, 2021 IL App (1st) 200338 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 2013-CH-26214, 2013-L-11973, 2014-L-9779; the Hon. Sanjay Tailor, Judge, presiding. |
| **Attorneys for Appellant:** | Bruce A. Slivnick, of Deerfield, for appellant. |
| **Attorneys for Appellee:** | Karen L. Levine, Edward W. Feldman, and Alexandra K. Block, of Miller Shakman Levine & Feldman LLP, of Chicago, for appellee. |